IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

<table>
<tr><td>THE EAST ALABAMA WATER,<br>SEWER AND FIRE PROTECTION<br>DISTRICT,</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>CIVIL ACTION NO.</td></tr>
<tr><td>v.</td><td>)</td><td>3:09cv541-MHT</td></tr>
<tr><td></td><td>)</td><td>(WO)</td></tr>
<tr><td>WESTPOINT HOME, INC.,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant.</td><td>)</td><td></td></tr>
</table>

OPINION AND ORDER

Plaintiff East Alabama Water, Sewer and Fire
Protection District ("East Alabama") filed this lawsuit
against defendant WestPoint Home, Inc. ("WestPoint"),
charging, among other things, breach of contract.
Jurisdiction is proper pursuant to 28 U.S.C. § 1332
(diversity).

This lawsuit is before the court on WestPoint's
motion for summary judgment.  For the reasons that
follow, that motion will be denied.

## I.  SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing burden-shifting under Rule 56).  The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials in the pleadings.  Fed. R. Civ. P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the

2

matter, but rather to determine only whether a genuine issue exists for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## II.  BACKGROUND

In 1972, East Alabama entered into a written "Agreement for Waste Treatment Service" with West Point-Pepperell, Inc. ("WPP").  Ex. 1 to Am. Compl. at 1 (Doc. No. 21-1).  The agreement provided that East Alabama would construct a waste treatment system and "render sanitary sewer service to [WPP] by collecting any and all industrial and domestic waste from [specified WPP] facilities."  <u>Id</u>. at §§ 3 & 4.  Construction was financed, in part, "by the issuance of revenue bonds by [East Alabama," and it was "agreed that [WPP would] pay ... 75.85 % of each year's debt service (principal and

3

interest) on the portion of the bonds the proceeds of which [were] required for and applied toward construction of the System." Id. at § 5. In addition, WPP would "pay its portion of the operating costs of the System ... in each Contract Year," based on its use of the system. Id. at § 7. Under the terms of the contract, over 70% of the system's capacity was reserved for WPP. See id. at § 1.

East Alabama and WPP further agreed in writing that, "The term of this contract shall begin on the date this contract was executed by the parties hereto and shall expire on the twentieth anniversary of the [completion of the system]." Id. at § 2. The parties to this lawsuit agree that the system was completed, as defined by the written agreement, in July 1975. The parties also agree that the written agreement thus expired, by its own terms, in July 1995.[1]

---

1. The construction bonds mentioned above were also "to have a life which will expire no later than twenty (continued...)

4

The written agreement provides for renewal of its terms in the following provision:

> "Renewal: Upon 60 days written notice prior to the expiration of the term of this contract, [WPP] shall have the right to renew this contract for a like term upon similar terms and conditions; provided, however, that any further amortization charges or operating charges payable by [WPP] during said renewal period shall be determined prior to the expiration of this contract in accordance with ... [a specified] formula."

Id. at § 12.

In the early 1990's, well into the life of the written agreement, WPP was reorganized into WestPoint Stevens, Inc. ("WPS"). This re-organization did not interfere with performance of the agreement. There is no dispute that East Alabama, WPP, and then WPS, "each performed their obligations during the initial twenty year term." Pl's Br. at 6 (Doc. No. 33).

---

(...continued)
years from the Completion Date." Ex. 1 to Am. Compl. at § 5. However, at some point WPP and East Alabama agreed to restructure the bonds, ultimately extending their life to 2008.

"As the end of the ... twenty year term approached in July 1995, [WPS's] representative, Eddie Lanier, and East Alabama's manager, Stephen Hamilton, had discussions concerning the execution of a new [waste treatment] agreement." <u>Id</u>.  These discussions did not produce a new <u>written</u> agreement before the expiration date, nor did WPS exercise the renewal option noted above.  The discussions were referenced in a letter Lanier sent to Hamilton on June 27, 1995:

> "This letter is to confirm our recent conversations concerning the Agreement for Waste Treatment Services that you have with WestPoint Stevens.  This agreement will expire on 7/1/95.  Our discussions have indicated that you are agreeable to operating under the old agreement until the new agreement has been finalized.  If this is not the case, please give me a call at [specified phone number]."

Def.'s Ex. 4 to Segrest Dep. (Doc. No. 34-2).

At that point, according to Lanier, East Alabama and WPS had "jointly decided it was better to ... continue to operate under the old agreement on a temporary basis

until [they] got things more stabilized and could finalize the agreement." Lanier Dep. at 50:12-17 (Doc. No. 34-1). WestPoint now contends that the June 27 letter "memorializ[ed] the parties' agreement." Def.'s Br. at 3 (Doc. No. 28).

In contrast to Lanier's description of the discussions, Hamilton maintains that his "interaction with Eddie Lanier [in 1995] indicated [WPS's] desire to continue under the contract for an additional 20 years." Hamilton Dep. at 27:4-5 (Doc. No. 35-1).[2]  Indeed, he claims that "none of [their] discussions ever indicated any shorter term than ... the 20-year duration of the contract." Id. at 55:24-56:1.

---

2.   WestPoint notes that, "Hamilton's deposition was taken after the Motion for Summary Judgment had been filed." Def.'s Reply at 2 n.1 (Doc. No. 35.) Nonetheless, it cites to Hamilton's deposition throughout its reply brief. See, e.g., id. at 2, 3, 4 & 8. It also asserts that, "the deposition transcript [does not] raise a fact question material to summary judgment." Id. at 2 n.1.

Hamilton agrees that the June 27 letter "is an accurate summary of [his] conversations with Eddie [Lanier]."  <u>Id</u>. at 57:19-21.  His interpretation of that letter, however, diverges from that now provided by Lanier.  He read the letter as describing an agreement to renew the contract <u>and</u>, apparently, a further agreement to later modify or nullify aspects of the contract.[3]  He explains as follows:

> "My understanding of our agreement was that the old contract was renewed, that we would continue to treat [WPS] waste, and they would continue to make their payments.  We [further] agreed that there ... was a need to update the contract to make it reflect current practices.  And to my thinking, that's the only, quote, 'new agreement' we were talking about; was updating the contract to reflect what we were billing for, because the treatment plant had changed tremendously from 1975 to 1995."

<u>Id</u>. at 63:21-63:5; <u>see also</u> <u>id</u>. at 61:4-8 ("Q: ... [W]hat in the world does [']until the new agreement has been

_____

    3.  East Alabama concedes that WPS had "concerns about [the] measuring of flow into the plant and other issues."  Pl.'s Br. at 6.

finalized['] mean?  A: Well, if you entered into a new agreement, then you would - part of that agreement would be to nullify the terms of the old agreement.").[4]

Hamilton and Lanier periodically discussed a "new agreement" until some time in 1998, but no new written agreement was ever produced.  Lanier admits that at no point during those discussions did he explicitly express the opinion that the parties were operating under a contract that was terminable at will.  See Lanier Dep. at 54:7-56:8.  Indeed, he states that "it never came up about whether we could cancel or when we would cancel." Id. at 56:13-14; see also Hamilton Aff. at ¶ 6 (Doc. No. 34-6) ("In my discussions with Eddie Lanier, he never

---

4.  Hamilton was asked, "If Eddie [Lanier] were to tell us that he never intended to enter into a 20-year agreement back in 1995, do you have a reason to think he's lying about that?"  Hamilton Dep. at 59:16-18.  He responded, "I would disagree with him."  Id. at 59:20. When asked, "Do you think [Lanier] did intend to enter into a 20-year agreement," he responded, "I did," explaining that "there was no discussion that it was otherwise, and the actions of WestPoint, from prior to later, indicated that the contract was in full force." Id. at 59:21-60:2.

characterized the arrangement between the parties after 1995 as a 'temporary agreement.'").

In 2003, WPS filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. <u>See</u> Def.'s Ex. 6 to Segrest Dep. (Doc. No. 34-2). WPS "was not reorganized--instead a new company, WestPoint, the only defendant in this action, bought certain assets and assumed certain liabilities of WPS." Def.'s Br. at 4. The "arrangement for wastewater treatment services then in effect was one of the liabilities WestPoint assumed." <u>Id</u>.

In 2006, approximately eleven years after the written contract had expired, Tony Segrest replaced Hamilton as East Alabama's manager. Lanier, now employed by WestPoint, met with Segrest and later sent him an email "explaining how our relationship ... worked." Lanier Dep. at 64:23-65:1. He wrote, in part,

> "You had asked for some information on the wastewater budgeting process between WestPoint Home (WPH) and East Alabama. Our contract (I gave you a copy of when

10

> we met in your office), requires that
> East Alabama provide us an operating
> budget each year that we can use to
> develop our wastewater treatment budgets
> at each facility."

Pl.'s Ex. 6 to Lanier Dep. at 1 (Doc. No. 34-1). The contract referred to in the email is the 1972 written contract.

It is undisputed that East Alabama, WPS, and then WestPoint, each performed under the terms of the 1972 written agreement through 2008. But in 2008, "[d]ue to plant closures, WestPoint's usage of the plant declined drastically." Pl.'s Br. at 11. On November 14 of that year, general counsel for WestPoint sent Segrest written notice of termination of the parties' wastewater treatment agreement effective January 1, 2009. See Pl.'s Ex. 11 to Lanier Dep. (Doc. No. 34-1).

East Alabama subsequently filed the instant complaint, alleging, among other things, breach of contract. It claims that, "After giving notice of termination, WestPoint refused to pay the monthly amounts

11

owed under the Agreement." Pl.'s Br. at 11. It further alleges that, "The unpaid amounts accrued as of March 31, 2010 total $ 521,457.63." Id. WestPoint admits that it "remains an East Alabama customer." Def.'s Br. at 8 n.1.

### III.  DISCUSSION

#### A.  Breach-of-Contract Claim

East Alabama maintains that WestPoint is contractually bound by the terms of the written agreement until July 2015, and that, "By attempting to cancel the contract before expiration of the contract term, WestPoint is in breach of the agreement." Def.'s Br. at 2. As should be clear from the detailed factual background provided above, East Alabama does not assert that either WestPoint or WPS entered into a new written agreement after the initial agreement expired in 1995. Nor does it claim that WPS exercised the agreement's renewal option. Rather, it contends that the parties are bound by an implied-in-fact contract.

"An implied contract arises where there are circumstances which, according to the ordinary course of dealing and common understanding, show a mutual intent to contract." Broyles v. Brown Engineering Co., 151 So. 2d 767, 770 (Ala. 1963); Radiology Associates, P.A. v. St. Clair Timber, Co., 563 So.2d 1020, 1021 (Ala. 1990) ("An implied-in-fact contract may be found from circumstances showing that a mutual agreement had been reached." (citation omitted)). "Such a contract must contain all the elements of an express contract, which rests on consent, and is to every intent and purpose an agreement between the parties, and it cannot be found to exist unless a contract status is shown." Broyles, 151 So. 2d at 770; see also Steiger v. Huntsville City Bd. of Educ., 653 So. 2d 975, 978 (Ala. 1995) ("A contract implied in fact requires the same elements as an express contract."). "The difference between an expressed and an implied contract is merely in the mode of proof." Broyles, 151 So. 2d at 770.

13

"It is a general rule of law that where parties who have entered into a contract continue their respective performances under the terms of the contract beyond the expiration date of the contract, the parties are deemed to have mutually agreed to a new implied contract encompassing the same terms." Gafnea v. Pasquale Food Co., 454 So. 2d 1366, 1369 (Ala. 1984) (citations and quotation marks omitted). In this case, East Alabama, WPS, and then WestPoint, performed under the terms of the written agreement for more than 13 years after it expired.

WestPoint argues that no implied-in-fact 20-year contract could exist because, "WPS and East Alabama made the deliberate decision ... to operate under the terms of the expired agreement on a temporary basis while they attempted to negotiate a new contract." Def.'s Br. at 5. Indeed, it asserts that "there is no dispute of fact that the parties did in fact reach an agreement in 1995, and that this agreement did not specify as to duration."

14

Def.'s Reply at 4.   According to WestPoint, this "arrangement was memorialized in Eddie Lanier's letter of June 27, 1995." <u>Id</u>.

In support of this argument, WestPoint cites to Hamilton's deposition, noting that he agreed that the June 27 letter was "an accurate summary of [his] conversations with Eddie [Lanier]." Hamilton Dep. at 57:19-21.   It conveniently ignores, however, that Hamilton went on to provide a description of the "agreement" reached, and an interpretation of the letter, that diverges substantially from that provided by Lanier.

Given the totality of Hamilton's testimony, the court finds a material dispute of fact with respect to whether the parties did in fact reach an agreement in 1995.[5]  "The question of whether there has been mutual assent between the parties is an issue to be determined by the trier of fact." <u>Big Thicket Broadcasting Co. v. Santos</u>, 594 So. 2d

---

5.   At the very least, there is a dispute as to the content of any such agreement.

15

1241, 1243 (Ala. Civ. App. 1991).  Thus, the court must reject this argument as a basis for summary judgment.[6]

Alternatively, WestPoint argues that no implied-in-fact 20-year contract could exist because any inference of mutual intent to so contract is defeated by an expressed declaration to the contrary.  Despite the general rule regarding performance of a contract after expiration, "where mutual agreement is contradicted by the statements of either party at the time ... there can

---

6.  For the same reason, the court must reject WestPoint's argument that "East Alabama is estopped from claiming that conduct consistent with the temporary arrangement could give rise to an implicit contract." Def.'s Br. at 15.   That argument too relies on the assertion that, "It is undisputed that East Alabama agreed to the temporary arrangement proposed by Mr. Lanier on behalf of WPS."   Id.   Similarly, while the court accepts that an agreement by WestPoint "to continue [a] temporary agreement following WPS's bankruptcy ... [would not] transform [a] temporary agreement into a twenty year commitment," def.'s reply at 7, the court has not found a temporary agreement.   As WestPoint itself concedes, it "assumed the rights and liabilities in existence at the time of the bankruptcy." Def.'s Br. at 15.   For reasons discussed above and below, just what rights and liabilities existed at the time of bankruptcy will be determined at trial.

16

be no implication of contractual under-taking by that
party." <u>Broyles</u>, 151 So. 2d at 770. According to
WestPoint, "the relevant declaration appears in Mr.
Lanier's [1995] letter, which plainly contemplates a
temporary arrangement." Def.'s Reply at 5. But the key
sentence in that letter--"Our discussions have indicated
that you are agreeable to operating under the old
agreement until the new agreement has been finalized"--
cannot, at this stage of the lawsuit, carry the weight
that WestPoint assigns it. The court does not read the
sentence as an express refusal to renew the contract or
a clear rejection of a long-term contract. Moreover, and
as noted above, Hamilton's account of the "discussions"
referenced in that sentence, and his related
interpretation of the sentence itself, raise questions
about the intentions of the parties. Such questions are
for the trier of fact to resolve.

Even if a long-term agreement was reached, WestPoint
argues that it cannot be enforced as the "purported

17

twenty-year agreement runs afoul of one of the bedrock principles of Alabama law--the Statute of Frauds." Def.'s Br. at 6.  1975 Ala. Code § 8-9-2 states, in relevant part, that:

> "In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by therewith or some other person by him thereunto lawfully authorized in writing:
>
> (1) Every agreement which, by its terms, is not to be performed within one year from the making thereof."

But as the Alabama Supreme Court has explained, "This argument overlooks the fact that the original contract is in writing and indicates the terms of the [alleged] implied contract."  Gafnea, 454 So. 2d at 1369.

Having rejected the arguments raised by WestPoint, the court will deny summary judgment with respect to East Alabama's breach-of-contract claim.

18

### B.   Other Claims

East Alabama also asserts claims of unjust enrichment, quantum meruit, and payment due on an open account.  These claims rely on the allegation that East Alabama "has been and continues to be damaged by WestPoint's failure to compensate [it] for waste treatment services rendered."  Am. Compl. at ¶ 26.

WestPoint contends that it "is due summary judgment on these claims as well, as all depend on East Alabama's litigation position that there is a contract for wastewater treatment services running through 2015 and WestPoint has therefore exhausted ... credit due to it at the end of 2008."  Def.'s Br. at 8 n.1.  In other words, it maintains that, "An award of summary judgment on East Alabama's contract and specific performance claims thus compels an award of summary judgment on all other claims."  Id.  It offers no other arguments specific to these claims.

19

The court has rejected WestPoint's arguments with respect to the breach-of-contract claim and will deny its request for summary judgment on that claim. Thus, the court will also deny summary judgment with respect to the other claims.

***

For the foregoing reasons, it is ORDERED that defendant WestPoint Home, Inc.'s motion for summary judgment (doc. no. 28) is denied.

DONE, this the 21st day of June, 2010.

        /s/ Myron H. Thompson
    UNITED STATES DISTRICT JUDGE